# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6997 | **DATE** | July 10, 2001 |
| **CASE TITLE** | | Archer Daniels v. Narula | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ADM's motion for summary judgment [33-1] is denied. Narula's motion for partial summary judgment [22-1] is granted with respect to ADM's NUTRI-BEV mark and denied as to the remaining claims and marks. The parties should proceed with discovery in preparation for trial. A status conference to set a trial date is set for October 10, 2001, at 9:30 a.m. ENTER MEMORANDUM OPINION.

(11) x [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | | | |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** | |
| | No notices required. | | | number of notices | | |
| X | Notices MAILED by judge's staff. | | | **JUL 12 2001** | | |
| | Notified counsel by telephone. | | | date docketed | | **49** |
| | Docketing to mail notices. | | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to _____ | | | date mailed notice | | |
| KAM | courtroom deputy's initials | | ED-7 FILED FOR DOCKETING 01 JUL 11 PM 3:49 | | KAM mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | | | |

(Reserved for use by the Court)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ARCHER DANIELS MIDLAND COMPANY,   )
                                  )
        Plaintiff,            )
                                  )
        v.                   )
                                  )   No. 99 C 6997
ACHARAN SINGH NARULA, an        )
individual d/b/a NARULA RESEARCH, )
                                  )
        Defendant.          )

**DOCKETED**

JUL 1 2 2001

**MEMORANDUM OPINION**

Before the court is defendant's motion for partial summary judgment and plaintiff's motion for summary judgment. For the reasons explained below, defendant's motion is granted in part and denied in part, and plaintiff's motion is denied.

**BACKGROUND**

This is a trademark dispute between plaintiff/counter-defendant Archer Daniels Midland Company ("ADM"), which uses the "NUTRISOY," "NOVASOY," and "NUTRI-BEV" trademarks, and defendant/counter-plaintiff Dr. Acharan Singh Narula ("Narula"), an individual doing business as Narula Research, who uses the "NUTRA-SOY" trademark.

ADM's First Amended and Supplemental Complaint (the "Amended Complaint") alleges seven claims: (1) trademark infringement in violation of § 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a);

(2) false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) that Narula's registration of the NUTRA-SOY mark should be cancelled; (4) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 ("Illinois CFDBPA"); (5) violation of the Illinois Uniform Deceptive Trade Practices Act; 815 ILCS 510/2 ("Illinois UDTPA"); (6) common law unfair competition; and (7) common law passing off. ADM seeks, <u>inter alia</u>, to enjoin Narula from using the mark NUTRA-SOY or any similar trade name that too closely resembles its mark NUTRISOY, and seeks compensatory, enhanced, and punitive damages and attorney's fees.

Narula filed ten counterclaims: (1) for declaratory judgment of non-infringement of ADM's trademarks; (2) trademark infringement in violation of § 32(1)(a) of the Lanham Act; (3) trademark infringement in violation of § 32(1)(b) of the Lanham Act, 15 U.S.C. § 1114(1)(b)[1]; (4) unfair competition in violation of § 43(a) of the Lanham Act; (5) violation of the Illinois UDTPA; (6) violation of the Illinois CFDBPA; (7) trademark infringement in violation of the North Carolina Trademark Registration Act, N.C. Gen. Stat. § 80-1 <u>et seq.</u>; (8) violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 <u>et seq.</u> ("North Carolina UDTPA"); (9) Illinois common law unfair

---

[1] Although this counterclaim cites to "15 U.S.C. 1115(1)(b)," it appears that "1115" is a typographical error that should read "1114," based on its context.

competition; and (10) North Carolina common law unfair competition. In addition to declaratory judgment of non-infringement and other forms of relief, Narula seeks to enjoin ADM from using any trade name which creates a likelihood of confusion with respect to NUTRA-SOY and seeks compensatory and punitive damages and attorney's fees.

Narula moves for summary judgment on ADM's claims. ADM moves for summary judgment on all of its claims and on all of Narula's counterclaims.

## A. __ADM--Relevant Facts__

Plaintiff/counter-defendant ADM owns the federally registered trademark NUTRISOY, U.S. Reg. No. 1,686,614, dated May 12, 1992, for "soybean flakes used in making bakery products and other foods; soybean flour and soybean grits." (Narula Response to ADM's 56.1(a)(3) Statement of Facts, ¶ 2; ADM Memorandum, Ex. E.) ADM contends (and the NUTRISOY registration certificate states) that ADM has used the NUTRISOY mark on those products since 1946. (ADM Memorandum at 7 & Ex. E.) The mark has become incontestable within the meaning of § 15 of the Lanham Act, 15 U.S.C. § 1065. (Narula Response to ADM's 56.1(a)(3) Statement of Facts, ¶ 3.)

ADM asserts that it developed a "NUTRISOY branding program" in response to the FDA's announcement in November 1998 that it would allow advertisers to claim that the consumption of soy protein is linked with a reduced risk of heart disease. (ADM Memorandum at 8-

9.) The purpose of the branding program is to inform consumers, through the presence of ADM's NUTRISOY mark on a product, that the product contains "a healthy dose" of ADM's soy protein products. (Narula Response to ADM's 56.1(a)(3) Statement of Facts, ¶ 8.) Pursuant to the branding program, ADM gives manufacturers who purchase soy protein products from ADM, including soy flakes, flour, grits, protein concentrates, and protein isolates, the opportunity to take a license under ADM's NUTRISOY mark. (Id., ¶ 9.) If a manufacturer participates in the branding program, purchases a soy protein product from ADM, and uses a significant amount of that product as an ingredient in products that meet ADM's quality standards, ADM grants the manufacturer a license to display the NUTRISOY mark on its products and to use the mark in advertisements and promotional materials. (Id., ¶ 10.)

Thus, ADM asserts, in recent years, the "form and use" of the NUTRISOY goods "naturally expanded to include products such as soy isoflavone[2] and concentrates." (ADM Memorandum at 7.) ADM commissioned a trademark search related to those expanded goods, through which it learned of Narula's NUTRA-SOY trademark, described below. (ADM Response to Narula's 56.1(a)(3) Statement of Facts, ¶ 20.) Although it had knowledge of Narula's NUTRA-SOY trademark, ADM filed a new intent-to-use trademark application on June 22,

---

[2] According to the materials ADM submitted in support of its motion, isoflavones are plant-based estrogens that have been shown to help lower the risk of many human diseases, particularly those that are hormone-related. (ADM Memorandum, Ex. C, NOVASOY Frequently Asked Questions Web page.)

1999 to cover the expanded goods under the NUTRISOY mark. (ADM Response to Narula's 56.1(a)(3) Statement of Facts, ¶¶ 45, 47.) The Patent and Trademark Office (the "PTO"), however, rejected ADM's intent-to-use application on the ground that the mark would be likely to cause confusion with Narula's NUTRA-SOY trademark. (Id., ¶ 46.)

Moreover, on February 23, 2000, ADM received an assignment of rights from a third party, Nutrisoy International, Inc. ("NII"), in "all right, title and interest that [NII] may [have had] in and to the mark NUTRISOY, the name Nutrisoy International, and the domain name NUTRISOY.COM." (the "NII Assignment") (ADM Memorandum, Ex. P, Assignment.) ADM received the assignment as part of the settlement of an infringement suit it brought against NII. (Id.)

NII was a small company located in Evansville, Indiana, and was operated by an individual named Dr. Carl Barniak. (Narula 56.1(a)(3) Statement of Facts, ¶ 54.)[3] NII sold several retail

---

[3] In its response to Narula's 56.1(a)(3) Statement of Facts, ADM "denies" this statement. After reviewing Dr. Barniak's deposition, we do not understand why. ADM does not specify its reason for contesting the statement, nor does it include specific references to affidavits, parts of the record, or other material to support its position, as required by Local Rule 56.1(b)(3)(A). In fact, as Narula points out, ADM fails to do so throughout its entire 56.1(b)(3) response. ADM contends that it has specifically identified which facts are in dispute and associated supporting evidence in its memorandum of law in support of its motion, which is "incorporated by reference" in its 56.1(b)(3) response. (ADM's 56.1 Reply at 3.) ADM justifies its circumvention of Rule 56.1 by arguing that compliance would "add another six inches (at least) to the stack of irrelevant and duplicative documents and exhibits that Nurula [sic] has already inflicted upon the Court." (Id.) We doubt, however, that ADM was motivated by a desire to minimize the extent of the material this court must review to decide these motions. Rather, its failure to comply with Rule 56.1 appears to be the result of simple neglect.

The Seventh Circuit has "endorsed the exacting obligation" that rules such as Local Rule 56.1 "impose on a party contesting summary judgment to highlight

products, including two soy products called "Essential Protein" and "Essential Proplus." (ADM Response to Narula's 56.1(a)(3) Statement of Facts, ¶ 56.) The word NUTRISOY did not appear standing alone on the products; it appeared as part of the "Nutrisoy International, Inc." company name and phrases such as "Essential Protein from NutriSoy" on the product labels, promotional materials, and advertisements. (Narula 56.1(a)(3) Statement of Facts, ¶ 58; Narula Response to ADM's 56.1(a)(3) Statement of Facts, ¶ 23.) The phrase "Nutrisoy International, Inc." appeared in a smaller font and typeface than the "Essential Protein" and "Essential Proplus" brand name marks on the products. (ADM Response to Narula's 56.1(a)(3) Statement of Facts, ¶¶ 59-60.)

NII did not own a federal trademark registration covering its use of the term NUTRISOY. (Id., ¶ 57.) Upon executing the assignment to ADM, NII was precluded from using the NUTRISOY mark or trade name, but it was free to continue using the "Essential Protein" and "Essential Proplus" marks. (Id., ¶ 62.) NII now sells the "Essential Protein" and "Essential Proplus" (now called

---

which factual averments are in conflict as well as what record evidence there is to confirm the dispute." Waldridge v. American Hoechst Corp., 24 F.3d 918, 921-22 (7th Cir. 1994). We are not obliged to "scour the record looking for factual disputes"; rather, we have the discretion to deem an improperly controverted statement admitted. See id.; Flaherty v. Gas Research Inst., 31 F.3d 451, 453 (7th Cir. 1994). The non-movant's inclusion of facts in the body of his responsive memorandum is insufficient. See Knox v. McGinnis, 998 F.2d 1405, 1408 (7th Cir. 1993). Accordingly, where appropriate, we deem as admitted certain statements that are not properly controverted.

    Narula also violates Rule 56.1. Various propositions in his 56.1(a)(3) Statement of Facts are supported only by citations to his counterclaims, which are not evidence. Therefore, even if ADM has inadequately controverted certain statements, we do not deem those statements admitted where they are not properly supported in the first place.

"Essential Isoflavones") under the "Mothersoy, Incorporated" trade name. (<u>Id.</u>, ¶ 63.)

ADM also owns the federally registered trademark NOVASOY, U.S. Reg. No. 2,262,436, dated July 20, 1999, for "soy extracts and isoflavones for use as dietary and nutritional supplements, and as ingredients for dietary and nutritional supplements." (Narula Response to ADM's 56.1(a)(3) Statement of Facts, ¶ 16; ADM Memorandum, Ex. B.)

## B.   Narula--Relevant Facts

Defendant/counter-plaintiff Narula contends that in 1996, he developed an all- natural, genistein[4]-enriched soy protein beverage powder for use as a food supplement. (Narula 56.1(a)(3) Statement of Facts, ¶ 2.) In 1997, he developed a name for this product. Narula contends that he selected the name NUTRA-SOY for his product only after conducting an internet search of the PTO's records and failing to find other NUTRA-SOY marks spelled with either an "a" or an "i." (<u>Id.</u>, ¶¶ 10, 11.) ADM disputes that Narula conducted such a search. (ADM Response to Narula's 56.1(a)(3) Statement of Facts, ¶ 11; ADM Memorandum at 12-13.) Narula also contends that at the time he selected the NUTRA-SOY name, he had never heard of ADM's NUTRISOY product or trademark. (Narula 56.1(a)(3) Statement of Facts, ¶¶ 12-13.) ADM disputes this contention as well, pointing out that Narula testified at his deposition that, in 1996, he was

---

[4]   According to the NUTRA-SOY product label, genistein is "the principal soy isoflavone." (ADM Amended Complaint, Ex. 11.)

in contact with an ADM scientist regarding soy protein and soy isoflavones and ADM's protein products. (ADM Response to Narula's 56.1(a)(3) Statement of Facts, ¶ 12; ADM Memorandum at 10.) ADM also disputes Narula's assertion that he was not aware of Nutrisoy International, Inc. at the time Narula selected his NUTRA-SOY trademark. (ADM Response to Narula's 56.1(a)(3) Statement of Facts, ¶ 14.)

Narula first used his NUTRA-SOY trademark as early as January 15, 1998. (Id., ¶ 15.) On January 21, 1998, the Secretary of State of North Carolina issued a North Carolina state trademark registration to Narula for the mark NUTRA-SOY for use with food supplements. (Id., ¶ 16.) On February 17, 1998, Narula filed his NUTRA-SOY federal trademark application. (Id., ¶ 17.) The trademark was published for opposition on May 18, 1999; neither ADM nor anyone else opposed the registration of Narula's NUTRA-SOY mark. (Id., ¶ 18.) On August 10, 1999, the PTO issued Narula a federal trademark registration for NUTRA-SOY, U.S. Reg. 2,268,545, for a "food supplement, namely, an all-natural genistein-enriched soy protein beverage powder." (Id., ¶ 19.) There is no evidence of actual confusion between Narula's use of his NUTRA-SOY mark and ADM's use of its NUTRISOY mark. (Narula 56.1(a)(3) Statement of Facts, ¶ 23.)[5]

_____

[5] Although ADM "denies" this statement, it is deemed admitted. See supra n.3. ADM has submitted no evidence to the contrary, and ADM's own Rule 30(b)(6) witness testified that he was not aware of any instances of actual confusion. (Narula 56.1(a)(3) Statement of Facts, Ex. 11, Deposition of Philip C. Fass, at

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Management Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

### A.   State Law Claims

Because the parties did not present any argument as to the following claims in their summary judgment briefs, we will not grant summary judgment to either party on them: (1) ADM's fourth,

---

106-07, 109.)

fifth, sixth, and seventh claims (Illinois CFDBPA; Illinois UDTPA; common law unfair competition, common law passing off); and (2) Narula's fifth, sixth, seventh, eighth, ninth, and tenth counterclaims (Illinois UDTPA; Illinois CFDBPA; North Carolina trademark infringement; North Carolina UDTPA; unfair competition under Illinois law; and unfair competition under North Carolina law).

## B. **NUTRI-BEV Mark**

ADM states that its motion is "dispositive of all claims in this litigation" (ADM Memorandum at 20), but ADM does not address the alleged infringement of its NUTRI-BEV mark or offer any evidence regarding the NUTRI-BEV mark. Therefore, to the extent ADM's motion is premised on the infringement of that mark, it is denied.

ADM also fails to respond in any manner to Narula's argument in his motion that Narula's use of the NUTRA-SOY mark does not infringe upon ADM's NUTRI-BEV mark. Therefore, we grant Narula's motion for summary judgment as to the NUTRI-BEV mark.

## C. **NOVASOY Mark**

Regarding the NOVASOY mark, ADM alleges in its motion and supporting materials that Narula advertises that one of his products contains NOVASOY. (ADM Memorandum at 5.) In support of this allegation, ADM submits Narula's invoices for four shipments of NUTRA-SOY to an individual named Dr. Susan Delaney. (ADM

Memorandum, Ex. D.)  The relevant part of each invoice reads: "Nutra-Soy Isoflavone Capsules (contains **Novasoy**)." (<u>Id.</u>, boldface in original.)  ADM argues that Narula uses the NOVASOY mark without ADM's consent, without attributing the trademark to ADM and without notifying his customers that Narula and his products are not affiliated with, sponsored by, or approved by ADM.  ADM contends that such use creates a likelihood of confusion, and thus Narula is infringing the NOVASOY trademark.  Narula responds that his use of the NOVASOY mark did not cause confusion as to source; his use of the mark is protected under the nominative fair use doctrine; and that ADM's argument fails under the first sale doctrine.  (Narula Combined Response/Reply at 2-8.)

To the extent that ADM's motion for summary judgment is based on the alleged infringement of its mark NOVASOY, it is denied.  As Narula points out, ADM's Amended Complaint does not allege infringement based on the conduct it argues in its summary judgment motion.  The Amended Complaint does not allege that Narula used the NOVASOY trademark; rather, the conduct alleged relates only to Narula's use of his NUTRA-SOY mark.  We cannot grant summary judgment (to ADM or Narula) on a claim that appears for the first time in a memorandum in support of a summary judgment motion.

**D.  <u>NUTRISOY Mark</u>**

To prove trademark infringement or unfair competition under the Lanham Act, a plaintiff must show that (1) it has prior

protectable rights in the trademark; and (2) the relevant group of buyers is likely to confuse the alleged infringer's products with those of the plaintiff. <u>See</u> 15 U.S.C. §§ 1114, 1125(a); <u>Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.</u>, 128 F.3d 1111, 1115 (7th Cir. 1997); <u>Forum Corp. v. Forum, Ltd.</u>, 903 F.2d 434, 439 (7th Cir. 1990).

ADM claims that there are two independent sources of its priority in the NUTRISOY mark over Narula. One source is the NII Assignment; the other source is its own registered NUTRISOY mark.

### 1. <u>The NII Assignment</u>

The NII Assignment purported to convey to ADM "all right, title and interest that" NII had "in and to the mark NUTRISOY, the name Nutrisoy International and the domain name NUTRISOY.COM, together with the good will relating to said mark and names." (ADM Memorandum, Ex. P.) Narula argues that the NII Assignment was an "assignment in gross" and thus invalid. Narula also contends that NII did not have prior rights in the mark because (1) NII did not use NUTRISOY as a trademark; and (2) NII's use of NUTRISOY was <u>de minimis</u>. (Narula Memorandum at 3-9.)

### a. <u>Prior Protectable Rights</u>

### i. <u>Assignment in Gross</u>

Generally, an assignment of a trademark entitles the assignee to "step into the shoes" of the assignor and gain whatever priority the assignor might have had in the mark. <u>See</u> <u>Clark & Freeman Corp.</u>

v. Heartland Co., 811 F. Supp. 137, 139 (S.D.N.Y. 1993). Thus, if
NII had protectable rights in the NUTRISOY mark over Narula, then
ADM would as well because it stepped into NII's shoes through the
assignment. See Carnival Brand Seafood Co. v. Carnival Brands,
Inc., 187 F.3d 1307, 1309-10 (11th Cir. 1999). "The fact that an
assignment of a mark was motivated by the assignee's motivation to
acquire a priority date earlier than a rival does not detract from
the validity of the assignment." 2 J. Thomas McCarthy, McCarthy on
Trademarks and Unfair Competition § 18:16.1, at 18-31.

However, where a trademark has been assigned "in gross," i.e.,
without the accompanying good will of the assignor's business, the
assignment is invalid. See Money Store v. Harriscorp Fin., Inc.,
689 F.2d 666, 676 (7th Cir. 1982); Clark & Freeman, 811 F. Supp. at
139. This is because a trademark is meaningless apart from the
good will of the business with which it is associated. See Marshak
v. Green, 746 F.2d 927, 929 (2d Cir. 1984). "Good will" is the
advantage obtained from use of a trademark, including public
confidence in the quality of the product and in the warranties made
on behalf of the product, and the public's name recognition of the
product that differentiates it from others. See Premier Dental
Prods. Co. v. Darby Dental Supp. Co., 794 F.2d 850, 853 n.3 (3d
Cir. 1986). McCarthy discusses the rationale behind the anti-
assignment in gross rule as follows:

> If one obtains a trademark through an assignment in
> gross, divorced from the good will of the assignor, the
> assignee obtains the symbol, but not the reality. Any

> subsequent use of the mark by the assignee may be in connection with a different business, a different good will and a different type of product. The continuity of the thing symbolized by the mark is broken. Use of the mark by the assignee in connection with a different good will and different product may result in a fraud on the purchasing public, who reasonably assume that the mark signifies the same nature and quality of goods or services, whether used by one person or another.

2 McCarthy § 18:3, at 18-7 to 18-8 (quoted with approval in Money Store, 689 F.2d at 676).

ADM contends that "the assignment undisputedly provides that NII transfers . . . good will to ADM." (ADM Memorandum at 18.) But the mere fact that the assignment document recites that good will was assigned along with the mark is not dispositive; courts look to the reality of the transaction to determine if good will has passed. See Money Store, 689 F.2d at 676; 2 McCarthy § 18:24, at 18-45.

ADM further argues that, where a trade name or mark is assigned as part of the settlement of a bona fide infringement suit, the assignment includes the transfer of good will. For this proposition, ADM cites to E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280 (9th Cir. 1992). There, the Ninth Circuit held that because an alleged infringement "wrongfully took goodwill" from the trademark owner as a result of consumer confusion, an assignment from infringer to trademark owner as part of the settlement of the lawsuit conveyed this "rubbed off" good will back to the trademark owner. See id. at 1289. The Gallo case is inapposite, though, because the district court had explicitly found that prior to the

assignment, many consumers believed that the infringer's products were put out by the trademark owner. ADM has not submitted evidence showing that consumers believed that NII's products were put out by ADM. Accordingly, we do not believe that the NII Assignment necessarily included a transfer of good will simply because it resulted from a bona fide infringement suit.

ADM also claims that the assignment was valid because NII stopped using the term NUTRISOY and the NUTRISOY.COM internet domain name, and ADM is currently using both the term and the domain name. But forbearance alone is not sufficient to establish a transfer of good will. See Clark & Freeman, 811 F. Supp. at 139 ("[I]f forbearance alone were sufficient, then discussion of 'consumer deception' would be irrelevant, since an assignee could use the mark for any product desired as long as the assignor halted operations. Goodwill is not such a mechanistic concept.")

Some courts have framed the inquiry by referring to "two tests" that have been identified for determining whether the assignment of a mark includes the passing of good will. The first "test" asks whether the assignee is able to go on in "real continuity with the past" or if there is a "continuity of management." See Clark & Freeman, 811 F. Supp. at 140 n.3 (citing Bambu Sales, Inc. v. Sultana Crackers, Inc., 683 F. Supp. 899, 904-05 (E.D.N.Y. 1988) and Marshak, 746 F.2d at 930). The second "test" examines whether ADM is producing a product substantially similar to that of NII such that consumers would not be deceived by

the assignment (in other words, that the associational significance of the mark would not be disrupted). See Marshak, 746 F.2d at 930; eMachines, Inc. v. Ready Access Memory, Inc., No. EDCV00-00374-VAPEEX, 2001 WL 456404, at *11 (C.D. Cal. Mar. 5, 2001).[6] The case law is vague as to whether a party seeking to invalidate a trademark transfer as an assignment in gross must show that the assignment fails both "tests."

Rather than structuring the inquiry as two rigid "tests," we prefer as more workable McCarthy's general formulation:

> [C]ourts will look to the reality of the transaction to see if "good will" passed. . . . [T]he emphasis should not be on a formalistic transfer of bits and pieces of tangible assets, but upon whether the assignee will probably go on in real continuity with the past. The focus should be on protecting customers' legitimate expectation of continuity under the mark, not on searching for a "stereo-typed set of formalities." As one commentator observed, "The emphasis must be laid not upon ceremony but upon the substance of the transaction, to the end that deception of the public will be avoided and the transferee will receive all of the indicia of the goodwill of the business symbolized by the mark assigned.

2 McCarthy § 18:24, at 18-45 to 18-46. One factor is whether the assignee continues to produce goods of the same nature and quality previously associated with the mark. See Clark & Freeman, 811 F. Supp. at 140-42; Main Street Outfitters, Inc. v. Federated Dep't Stores, Inc., 730 F. Supp. 289, 291 (D. Minn. 1989).

---

[6] "Case law on 'substantial similarity' is only moderately instructive, since the facts of each case are distinct and dispositive." Clark & Freeman, 811 F. Supp. at 140.

ADM received no tangible assets of NII through the assignment other than the internet domain name NUTRISOY.COM.[7] ADM also admits that NII, now doing business as Mothersoy, Incorporated, continues to sell the same products, "Essential Proplus" (now "Essential Isoflavones") and "Essential Protein." (ADM Response to Narula's 56.1(a)(3) Statement of Facts, ¶ 63.) This evidence tends to show that good will was not transferred in connection with the NII Assignment.

However, ADM asserts that it is using the term NUTRISOY on the same type of product as that of NII--"products containing soy protein," including "Omega Blast," a ready-made beverage containing soy protein. (ADM Memorandum at 19.) ADM submits copies of two pages from its NUTRISOY.COM Web site. One page says "NutriSoy is Here! If you're looking for NutriSoy, look for its logo on the items below." It lists "Omega Blast" as one of the items. (ADM Memorandum, Ex. R.) The second page features "Omega Blast Smoothies," a small picture (apparently of the product label) and states: "Omega Blast Smoothies are a masterful blend of tasty nutrition and convenience. The product line is targeted to fit the meal replacement needs of a high energy, healthy, active

---

[7] We recognize that it is not <u>necessary</u> to a valid trademark transfer that tangible assets of the assignor pass to the assignee. <u>See</u> <u>Money Store</u>, 689 F.2d at 676. Nonetheless, the transfer of tangible assets is a factor in the analysis, especially in a situation such as the instant case, where the purported assignee buys less than the total assets of a business. <u>See</u> 2 McCarthy § 18:23, at 18-42 to 18-44 (noting that "[i]f the 'assignee' buys <u>none</u> of the tangible assets of the assignor and the assignor continues to sell the same products under a different mark, this would tend to prove that the assignee received no good will at all.")

lifestyle." The Web site pages are dated March 28, 2001. (Id.)

This evidence does not tell us enough about "Omega Blast" to permit us to fully compare it with NII's products. ADM's evidence actually seems to indicate that "Omega Blast" may not be similar to "Essential Protein" or "Essential Proplus" because "Omega Blast" is a ready-made beverage meant for meal replacement, while NII's products were powders used to make beverages. Furthermore, it is unclear whether NII's products were intended for meal replacement or as nutritional supplements. Narula submits no evidence on this issue. Thus, there is a genuine issue of fact as to whether ADM is producing a product similar in nature to that of NII.

Narula argues that ADM did not begin using the NUTRISOY mark with respect to the beverage powder until after Narula filed his federal registration for NUTRA-SOY and filed his counterclaim in this action. His 56.1(a)(3) Statement of Facts states that "ADM's NUTRISOY mark was not affixed to goods available to ordinary retail consumers until the launch of ADM's new NUTRISOY branding program in 2000." (¶ 48.) ADM denies this statement, but, as discussed in footnote 3, fails to specify the reason for contesting the statement or to supply any supporting evidence. Therefore, it is admitted. Nonetheless, Narula has not shown the fact to be material. He does not provide any law or policy argument on this issue, namely, whether this is a significant enough lapse in the association of the name NUTRISOY with beverage powder to constitute such a break in continuity that ADM cannot claim priority of use.

We also note that there is evidence in the record that ADM is applying and plans to apply the NUTRISOY name to products that are totally different from those that NII was producing, such as protein bars, pasta, and "veggie burgers." But the parties' briefs do not present the applicable law or policy arguments on the following question: even if "Omega Blast" were sufficiently similar to NII's products, is there a break in continuity such that ADM cannot claim priority of use because ADM is also applying the NUTRISOY name to additional products that are totally different from those of NII? In other words, does a significantly expanded use of the mark constitute a break in priority of use?

In sum, neither party has adequately briefed this issue, and the evidence indicates that there are genuine issues of material fact as to whether good will passed from NII to ADM as a result of the NII Assignment and as to whether there was expanded use of the NUTRISOY mark sufficient to constitute a break in continuity and priority of use.

### ii. **Use as a Trademark**

Even if the NII Assignment was valid, Narula contends, NII had not used the term NUTRISOY in a trademark sense and thus had no trademark rights to pass to ADM by assignment. He argues that the term NUTRISOY "did not appear standing alone as a trademark on the products" and "cannot be dissected out of the company name to form a trademark." (Narula Memorandum at 4.) ADM asserts that NII used the term as a trade name, that trade name rights are entitled to

protection just like trademarks, and that prior use of a trade name gives a user priority over a later, confusingly similar trademark. (ADM Memorandum at 15-16.)

Regarding the difference between trademarks and trade names, the Ninth Circuit has explained:

> Trademarks and trade names are technically distinct. Trade names are symbols used to distinguish companies, partnerships and businesses. Trade names symbolize the reputation of a business as a whole. In contrast, trademarks . . . are designed to identify and distinguish a company's goods and services. The major legal distinction between trademarks and trade names is that trade names cannot be registered and are therefore not protected under 15 U.S.C. § 1114. However, analogous actions for trade name infringement can be brought under section 43(a) [of the Lanham Act].

Accuride Int'l, Inc. v. Accuride Corp., 871 F.2d 1531, 1534 (9th Cir. 1989) (citations omitted). ADM is correct that protection against the confusing use of corporate names is afforded under the same basic principles that apply to trademarks in general; the test of infringement of corporate names is "likelihood of confusion." See id. at 1534-35; 1 McCarthy § 9:1, at 9-2.

It is undisputed that NII used the term NUTRISOY on its products and in its marketing materials as part of the "Nutrisoy International, Inc." company name and in the phrase "Essential Protein from NutriSoy" and other phrases on product labels. The company name appeared in a smaller font and typeface than the brand name marks "Essential Protein" and "Essential Proplus" on the soy protein product labels. NII also promoted its products through its Web site at NUTRISOY.COM and included this Web site address in its

advertisements. (ADM Memorandum, Ex. T, <u>Vegetarian Times</u> advertisement.)[8] ADM submits no evidence indicating that NII used the term NUTRISOY in any other manner. Each party submits the deposition of Dr. Carl Barniak, the owner of NII. As to the manner in which NII used the term NUTRISOY, Barniak testified:

> Nutrisoy was part of the company name and . . . the name of the products were "Essential Protein" and "Essential Proplus," and . . . "all natural Nutrisoy" [means] all natural products that come from Nutrisoy International Incorporated, and where [the label] says "Nutrisoy Nutrition Facts," that's meaning, that's short for Nutrisoy International Incorporated has products and these are the nutrition facts for these products. So that would be the use of the corporate name in a--as part of a phrase in the communication of some information.
>
> .   .   .
>
> Q. And when you say . . . "from Nutrisoy," [on the "Essential Protein" label] are you using Nutrisoy there to indicate to the public the name of your company?
> A. Yes.
> Q. And so Nutrisoy as it's used here . . . is not the brand name of one of the soy protein products; is that right?
> A. Right. Nutrisoy is an abbreviation for Nutrisoy International, Incorporated.

ADM Memorandum, Ex. U, at 82-83, 186 (quotation marks added and objection omitted).

The evidence shows that NII used the phrase "Nutrisoy International, Inc." as its trade name. Therefore, if the NII Assignment was a valid assignment, ADM succeeded to NII's use of that trade name in commerce. But ADM is not using NII's trade

---

[8] The copy of the advertisement for "Essential Proplus" submitted by ADM is difficult to read in its entirety, as it is dark in areas.

name; it is using the term NUTRISOY as a trademark and seeks to protect that use. It is a difficult question whether NII used its trade name or its abbreviation, NUTRISOY, in a trademark sense.

ADM argues that this inquiry is unnecessary, though, because "prior use of a trade name gives the user priority over a later, confusingly similar trademark." (ADM Memorandum at 16.) To support this argument, ADM cites without elaboration <u>Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.</u>, 841 F. Supp. 1339, 1351-52 (E.D.N.Y. 1994). <u>Dial-A-Mattress</u> held that prior "analogous use" of a trade name can be tacked on to use of a mark in order to claim priority. <u>See id.</u> at 1351-52. Use "analogous" to trademark use means "use of a nature and extent such as to create an association of the term with the user's goods." <u>Malcolm Nicol & Co. v. Witco Corp.</u>, 881 F.2d 1063, 1065 (Fed. Cir. 1989) (quoting what is currently 3 McCarthy § 20:16, at 20-35 to 20-36). This is another way of saying that a trade name (or nickname/abbreviation for that trade name) must be inherently distinctive, or have attained secondary meaning, to be entitled to protection against the use of a similar name or mark where confusion is likely. <u>See</u> 1 Jerome Gilson et al., <u>Trademark Protection and Practice</u> § 2.15[1], at 2-182. When one says that a trade name has acquired secondary meaning, it means that the relevant consumer pool knows of that supplier and has come to understand that its name is not the name of just any such type of business selling a particular type of goods but rather a specific

purveyor of those goods.  See <u>Platinum Home Mortgage Corp. v.</u>
<u>Platinum Fin. Group, Inc.</u>, 149 F.3d 722, 732 (7th Cir. 1998);
<u>Perini Corp. v. Perini Constr., Inc.</u>, 915 F.2d 121, 125 (4th Cir.
1990) ("In the case of a trade name, secondary meaning is '[t]he
power of a name . . . to symbolize a particular business.")(quoting
<u>Ideal Toy Corp. v. Kenner Prods. Div. of Gen. Mills Fun Group,</u>
<u>Inc.</u>, 443 F. Supp. 291, 305 n.14 (S.D.N.Y. 1977)).  The parties
have failed to address the issue of whether NII's trade name or its
abbreviation, NUTRISOY, had attained secondary meaning prior to
Narula's adoption and use of the NUTRA-SOY mark.

### iii. <u>De Minimis Use</u>

Narula also argues that, even if NII used NUTRISOY as a mark
and the NII Assignment was valid, ADM cannot establish priority
through the NII Assignment because NII's use of the term NUTRISOY
was <u>de</u> <u>minimis</u>.  (Narula Memorandum at 7-9.)  Narula's 56.1(a)(3)
Statement of Facts sets forth an exhaustive state-by-state
compilation of NII's sales (taken from invoices) prior to the
filing of Narula's federal trademark application for NUTRA-SOY.
(¶¶ 68-119.)  ADM responds that gross sales is not the same as
trademark use, and that Narula's characterization of NII's use as
<u>de</u> <u>minimis</u> ignores NII's "extensive" advertising and promotion of
NUTRISOY throughout all fifty states.  (ADM Memorandum at 17.)

As for the state-by-state sales figures set forth in Narula's
Statement of Facts, ADM's response to each is as follows: "Denied
to the extent statement purports to identify the full scope and

extent of NII's [use] of NUTRISOY in this state prior to Narula's actual and constructive use of NUTRA-SOY." (ADM Response to Narula's 56.1(a)(3) Statement of Facts, ¶¶ 68-119.) As discussed supra note 3, we deem admitted the sales figures set forth in paragraphs 68-119 of Narula's Statement of Facts because ADM neither specifies its reason for contesting the statements nor offers material contradicting Narula's figures.

ADM contends that "priority only requires that NII use NUTRISOY before Narula . . . and that NII then continued such use." (ADM Memorandum at 17.) ADM cites no supporting law, probably because its argument is overly simplistic and does not define "use."

"[I]n the absence of federal registration, prior ownership of a mark is only established as of the first actual use of a mark in a genuine commercial transaction." Allard Enters., Inc. v. Advanced Programming Resources, Inc., 146 F.3d 350, 358 (6th Cir. 1998). At common law, "use" meant sales to the public of a product with the mark attached. See Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 503 (7th Cir. 1992). The amount of activity that constitutes "use" is a factual question, determined on a case-by-case basis. See S Indus., Inc. v. Stone Age Equip., Inc., 12 F. Supp. 2d 796, 804-05 (N.D. Ill. 1998); Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp., 80 F. Supp. 2d 815, 879 (N.D. Ill. 1999). Traditionally, as long as there is a genuine use of the mark in commerce, "ownership may be established even if the

first uses are not extensive and do not result in deep market penetration or widespread recognition." <u>Allard</u>, 146 F.3d at 358; <u>see also</u> <u>Blue Bell, Inc. v. Farah Mfg. Co.</u>, 508 F.2d 1260, 1265 (5th Cir. 1975) ("Such use need not have gained wide public recognition."); <u>Kathreiner's Malzkaffee Fabriken Mit Beschraenkter Haftung v. Pastor Kneipp Med. Co.</u>, 82 F. 321, 326 (7th Cir. 1897) (holding that for rights in a mark to accrue, "[i]t is not essential that its use has been long continued, or that the article should be widely known, or should have attained great reputation"); <u>Lane Capital Management, Inc. v. Lane Capital Management, Inc.</u>, 15 F. Supp. 2d 389, 397 (S.D.N.Y. 1998); <u>Bell v. Streetwise Records, Ltd.</u>, 640 F. Supp. 575, 580 (D. Mass. 1986) ("While it is not required that a product be an instant success the moment it hits the market, its usage must be consistent with a 'present plan of commercial exploitation.'") (citation omitted).[9]

Although Narula is the party who submits NII's sales data and ADM unsuccessfully "denies" those figures, we believe that the sales figures actually work to ADM's benefit. The state-by-state sales figures for NII's products total nearly $50,000. Even aside from the advertising and marketing claimed by ADM, the extent of

---

[9] But cf. <u>Lucent Info. Management, Inc. v. Lucent Techs., Inc.</u>, 186 F.3d 311 (3d Cir. 1999) (holding that plaintiff's sales presentations and single sale prior to defendant's intent-to-use trademark filing were insufficient to establish priority). McCarthy explains that the <u>Lucent</u> decision creates a conflict with <u>Allard</u> and departs from the long-standing rule that initial sales and advertising need not be extensive and need not result in widespread recognition. <u>See</u> 2 McCarthy § 16:6, at 16-10 to 16-11. We adopt the traditional rule as set forth in <u>Allard</u>. <u>See also</u> <u>infra</u> our discussion of <u>Lucent</u>.

NII's sales is far beyond <u>de</u> <u>minimis</u>. Such sales are very different from the test marketing, internal corporate transactions, promotional gifts, and extremely small-volume sales held by some courts to fail to establish "use." <u>See, e.g.</u>, <u>Zazu</u>, 979 F.2d at 503; <u>Blue Bell</u>, 508 F.2d at 1266-67; <u>S Indus., Inc. v. JL Audio, Inc.</u>, 29 F. Supp. 2d 878, 887-88 (N.D. Ill. 1998). NII's sales are sufficient to prove that NII "used" the term NUTRISOY in commerce as a matter of law.

Narula argues that we should measure "use" by applying the four-factor test set forth in <u>Natural Footwear Ltd. v. Hart, Schaffner & Marx</u>, 760 F.2d 1383 (3d Cir. 1985). That case addressed the territorial limits of a senior user's mark when a junior user had used the same mark in a geographically remote market. The court formulated a "market penetration" test to determine whether injunctive relief was justified, measuring "(1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." <u>Id.</u> at 1398-99.

Narula appears to be urging us to apply the same sort of analysis the court used in <u>Lucent Information Management, Inc. v. Lucent Technologies, Inc.</u>, 186 F.3d 311, 323-325 (3d Cir. 1999). There, the Third Circuit "transported to the priority arena" the <u>Natural Footwear</u> test, which was "traditionally used to determine

the territorial scope of trademark rights by measuring the quantity of sales." 2 McCarthy § 16:6, at 16-10 to 16-11 (criticizing the majority opinion in <u>Lucent</u>). Judge Ackerman, dissenting, explained that it is improper to try to resolve the priority of use issue by using the market penetration test set forth in <u>Natural Footwear</u>, as it was not meant to be dispositive of the <u>ownership</u> of marks between two concurrent users:

> There is no indication in the history or subsequent application of the [<u>Natural Footwear</u>] test that it was intended to be used to discern the status of a prior user as an initial matter. Rather, the history and later reliance on the <u>Natural Footwear</u> test supports the conclusion that this test is a tool of equity designed to determine the appropriate remedy in a geographical dispute between two good faith users of a mark. In fact, one must remember that the <u>Natural Footwear</u> test is an exception to the well-established rule of law that a senior user is deemed the exclusive owner of the trademark.
>
> . . .
>
> The distribution of trademark rights is distinct from the question of appropriate remedy.
>
> . . .
>
> [A] company's attempts to establish a business with the aid of a trademark could be stifled by a competitor before that company's sales and "market penetration" ever reach the standard set forth in <u>Natural Footwear</u>. I do not believe this is what was intended under trademark law or under the Lanham Act. Indeed, the majority's formulaic adherence to <u>Natural Footwear</u> proceeds on the theory that a trademark must penetrate a particular geographic area in its inception rather than recognizing that a prior senior user is entitled to ownership of a mark in its development into a larger concern provided that its initial use is enough to grant it ownership rights.
>
> . . .
>
> The sounder analysis, I respectfully suggest, is to determine first whether a company has engaged in sufficient use of a mark under common law trademark law and, if there is a finding of infringement by another company, the court should consider that first company's

market penetration and other indicia of the equities
involved in the case to fashion appropriate injunctive
relief.

Lucent, 186 F.3d at 323-325.

The instant case is not a situation where two geographically
separated users of the same or similar mark are seeking to define
the territorial extent of their respective rights. Moreover, we
think the Natural Footwear test is inapplicable to the threshold
inquiry of "use" for the reasons explained by Judge Ackerman in his
Lucent dissent.

### b. **Likelihood of Confusion**

Because the briefs do not adequately address the issue of
whether ADM derived prior protectable rights in the NUTRISOY mark
by virtue of the NII Assignment, we decline to examine the
likelihood of confusion at this juncture. This likelihood of
confusion inquiry is identical to the second part of the Carnival
test, as described below.

### 2. **ADM's Registered Mark**

A couple of initial observations are in order. First, ADM
makes much of the fact that NUTRISOY is an "incontestable" mark
under 15 U.S.C. § 1065. The mark is incontestable, however, only
with respect to the products to which it applies--namely, "soybean
flakes used in making bakery products and other foods; soybean
flour and soybean grits." See Sunmark, Inc. v. Ocean Spray
Cranberries, Inc., 64 F.3d 1055, 1058 (7th Cir. 1995) ("That

SweeTarts is an incontestable mark for sugar candy does not make Sunmark the gatekeeper of these words for the whole food industry."). Here, the allegations of infringement revolve around the use of the mark or a similar mark in connection with soy protein beverage powder. ADM now seeks to apply its NUTRISOY mark to "soy protein concentrates for use in the manufacture of food products and nutritional supplements," "soy protein concentrates for use as nutritional supplements and infant formulas," "isolated soy proteins for use as food additives, food fillers, and meat extenders or substitutes, and soy-based food beverages," and "soy-based sauces." (Narula 56.1(a)(3) Statement of Facts, Ex. 15, ADM's Application for Trademark Registration (June 15, 1999).) Thus, the fact that NUTRISOY is an incontestable mark with respect to soybean flakes, flour, and grits is of little consequence in this analysis.

Second, throughout his briefs, Narula frames the issues by arguing that ADM has two marks with respect to NUTRISOY. Narula deems ADM's registered NUTRISOY mark as the "NUTRISOY Wholesale Mark" and contends that ADM's intent-to-use trademark application filed in 1999 pertained to ADM's 1999 adoption of a "NUTRISOY Retail Mark." Narula states that ADM's original NUTRISOY registration "is used in connection with bulk soy protein products sold exclusively at the wholesale level to food manufacturers," whereas "the second NUTRISOY trademark is an ingredient mark to be used in connection with goods sold at the retail level to ordinary

consumers." (Narula Memorandum at 2.) According to Narula, ADM has no rights in the retail market as to the NUTRISOY mark because soybean flakes, flour, and grits are not retail goods.

We reject Narula's wholesale/retail distinction as artificial; as far as we can tell, it has no basis in law. The protection afforded by federal registration of a mark extends to "the goods or services specified in the registration subject to any conditions or limitations stated therein." 15 U.S.C. § 1115(a). As Narula admitted in response to ADM's requests for admissions, ADM's NUTRISOY registration does not place any limitation on the channels of trade in which the identified goods are sold. (ADM Memorandum, Ex. N.) The issue here is not whether ADM has rights in the NUTRISOY mark in the retail market; it is whether ADM's rights in the NUTRISOY mark extend to goods not named in the registration certificate.

A case that we find extremely helpful in analyzing this issue is Carnival Brand Seafood Co. v. Carnival Brands, Inc., 187 F.3d 1307 (11th Cir. 1999). There, plaintiff, owner of the CARNIVAL trademark for shrimp and other seafood products, brought an infringement action against a seller of prepared Creole and Cajun food products and pre-cooked seafood products that also bore the CARNIVAL mark. The district court granted summary judgment for defendant, and plaintiff appealed. The Eleventh Circuit vacated the district court's judgment, holding that there were genuine

issues of material fact regarding whether plaintiff had priority in the mark.

The court explained that plaintiff was "unquestionably the senior user" of the mark with respect to raw shrimp, but because it never produced or sold pre-cooked seafood entrees as did defendant, priority in those goods depended on the application of the "natural expansion" theory. Carnival, 187 F.3d at 1310. Under that doctrine, the senior user's rights may extend into uses in "related" product or service markets. See id. (quoting Tally-Ho, Inc. v. Coast Community College Dist., 889 F.2d 1018 (11th Cir. 1989)). The court observed, however, that

> a trademark owner cannot by the normal expansion of its business extend the use or registration of its mark to distinctly different goods or services not comprehended by its previous use . . . where the result could be a conflict with valuable intervening rights established by another through extensive use . . . of the same or similar mark for like or similar goods and services.

Id. at 1310-11 (quoting American Stock Exch., Inc. v. American Express Co., 207 U.S.P.Q. 356, 364 (T.T.A.B. 1980)).

The Eleventh Circuit then set forth a two-part test for examining the "natural expansion" issue. First, a likelihood-of-confusion analysis is applied to determine priority in the use of a mark. This analysis is used because

> "[t]he 'natural expansion' thesis seems to be nothing more than an unnecessarily complicated application of the likelihood of confusion of source or sponsorship test to a particular factual situation. If the 'intervening' use was likely to cause confusion, it was an infringement, and the senior user has the right to enjoin such use, whether it had in fact already expanded itself or not."

Id. at 1311 (quoting what is currently 4 McCarthy § 24:20, at 24-41). "Once priority in the use of a mark for a particular class of goods or services has been established," it is necessary to perform the likelihood-of-confusion test "as of the current time and as between the plaintiff's current products (i.e., those that inherit the priority with respect to the previously used mark) and the allegedly infringing products of the defendant, to determine whether the plaintiff ultimately prevails in a trademark infringement litigation." Id. at 1311 n.4. In other words, there are two independent likelihood-of-confusion inquiries. See also 4 McCarthy § 24:20, at 24-40 to 24-43 (discussing "intervening rights and the zone of expansion"). We adopt the approach taken in Carnival.

Pursuant to the Carnival analysis, the issue is whether it would have been natural in 1998 for ADM to have expanded into soy protein beverage powder. In other words, was there a likelihood of confusion stemming from Narula's use of the NUTRA-SOY mark in 1998 in connection with soy protein beverage powder?

The seven factors that the Seventh Circuit uses for determining likelihood of confusion are (1) the degree of similarity between the marks in appearance and suggestion; (2) the similarity of the products for which the name is used; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the complainant's mark; (6) actual confusion; and (7) an intent on the part of the alleged

court's task of identifying the issues and rendering a decision more difficult.

## CONCLUSION

For the foregoing reasons, ADM's motion for summary judgment is denied.  Narula's motion for partial summary judgment is granted with respect to ADM's NUTRI-BEV mark and denied as to the remaining claims and marks.

The parties should proceed with discovery in preparation for trial.  A status conference to set a trial date is set for October 10, 2001, at 9:30 a.m.


Date:    July 10, 2001


ENTER:

_____
John F. Grady, United States District Judge

infringer to palm off his products as those of another.[10] See <u>Forum</u>
<u>Corp.</u>, 903 F.2d at 439. None of the seven factors is dispositive
in itself. See <u>AHP Subsidiary Holding Co. v. Stuart Hale Co.</u>, 1
F.3d 611, 616 (7th Cir. 1993). We are also mindful that, because
our ultimate conclusion on likelihood of confusion is a finding of
fact, "a motion for summary judgment in trademark infringement
cases must be approached with great caution." <u>Id.</u> When we use the
likelihood of confusion test to analyze a priority question, "we
must consider the state of events that existed at the time the
intervening use . . . commenced." <u>Carnival</u>, 187 F.3d at 1312.

The parties have completely missed the boat by failing to
discuss <u>Carnival</u> in their briefs. Given this failure, and given
the other problems with the briefs and evidence that we have
discussed <u>supra</u>, we need not undertake this analysis or embark on
the second part of the <u>Carnival</u> test (current likelihood of
confusion). Granting either party's motion would be unwarranted.

A final note regarding the briefs. Not only did they
inadequately address the applicable law and evidence, but they were
marked by a snide and unprofessional tone, particularly ADM's
briefs. Arguments laden with such derisive comments only make this

---

[10]/ The Eleventh Circuit uses a slightly different seven-factor test for
determining likelihood of confusion. Six of the seven factors are the same or
similar to those used in this Circuit, but the Eleventh Circuit identifies
"similarity of advertising" as a factor and does not identify "the degree of care
likely to be exercised by consumers" as a factor. See <u>Carnival</u>, 187 F.3d at
1311-12. In any event, the Seventh Circuit has indicated that its list of seven
factors is not exclusive. See <u>Nike, Inc. v. Just Did It Enters.</u>, 6 F.3d 1225,
1228 (7th Cir. 1993).